IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

                    Plaintiff,

        Vs.                                              No. 07-40140-01-SAC

RONALD EUGENE CHARLES, JR.,

                    Defendant.


MEMORANDUM AND ORDER

        The defendant pleaded guilty to a single-count indictment

charging felony possession of a firearm.  The Presentence Investigation

Report ("PSR") recommended a guideline sentencing range of 57 to 71

months based in part on U.S.S.G. § 2K2.1(a)(2), namely that this offense

was after two felony convictions, one for a crime of violence and one for a

controlled substance offense.  The defendant objected that his prior federal

conviction for escape from custody was not a crime of violence in light of

the Supreme Court's recent decision of *Begay v. United States*, 128 S. Ct.

1581 (Apr. 16, 2008), which narrowed the residual clause definition for a

crime of violence.

The district court overruled the defendant's objection and sentenced the defendant to 57 months of imprisonment, the bottom of the recommended guideline range. On appeal, the Tenth Circuit vacated the defendant's sentence and remanded the case for resentencing, because the Supreme Court's intervening decision in *Chambers v. United States*, 129 S. Ct. 687 (2009), "casts doubt as to whether Mr. Charles's conviction under 28 U.S.C. § 741(a) was a crime of violence." *United States v. Charles*, 576 F.3d 1060, 1063 (10th Cir. 2009).

## Prior Decision

The district court's ruling on this sentencing objection appears in the published opinion, *United States v. Charles*, 566 F. Supp. 2d 1229 (D. Kan. 2008). Recognizing that the definition of a "crime of violence" under U.S.S.G. § 4B1.2(a)(2)[1] is "virtually identical" to one definition of a "violent felony" under 18 U.S.C. § 924(e),[2] the court followed the lead of

---

[1]The definition of "crime of violence" under § 4B1.2(a)(2) is "burglary of a dwelling, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

[2]"'[V]iolent felony' means any crime punishable by imprisonment for a term exceeding one year, . . . that (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; . . . ." 18 U.S.C. § 924(e)(2)(B)(ii).

others in employing the common approach used in such determinations. 566 F. Supp. 2d at 1231. The court summarized the categorical approach of considering only the generic offense and its statutory elements, but it also recognized the modified approach when the statute "is ambiguous, or broad enough to encompass both violent and nonviolent crimes." 566 F. Supp. 2d 1231 (citing in part *Begay v. United States*, 128 S. Ct. 1581, 1584 (2008), *United States v. Perez-Vargas*, 414 F.3d 1282, 1284 (10th Cir. 2005)).

The court observed that the defendant's prior conviction was for a violation of 18 U.S.C. § 751(a) for having escaped the custody of a halfway house. *Id*. Notwithstanding that "[t]he Tenth Circuit has repeatedly held that escape is categorically a crime of violence because it always constitutes conduct that presents a serious potential risk of physical injury to another," the defendant objected to this precedent and argued that the Supreme Court in *Begay* had "effectively overruled" it. 566 F. Supp. 2d at 1231-32 (internal quotation marks and citations omitted). The court observed that "[w]hile it adds another test to the application of the residual clause, the holding in *Begay* does not necessarily overrule the Tenth Circuit's characterization of escape as crime of violence." *Id*. at 1232. The

court found that "the holding in *Begay* is that a similarity in the degree of risk is not enough for a crime to fall within the residual clause but that the crime must be 'roughly similar, in kind as well as in degree of risk posed, to the examples themselves.'"  566 F. Supp. 2d at 1233 (quoting *Begay*, 128 S. Ct. at 1585).

The district court considered the following:

> The application of the *Begay* decision is hardly a simple proposition.  *Begay* does not offer an expanded exposition upon what it means for a crime to be "roughly similar in kind as well as in degree of risk posed" to the enumerated offenses.  128 S. Ct. at 1585.  As far as the "one pertinent and important" difference between DUI and the listed offenses, the Court focused on the kind of conduct "typically" involved in the latter:  "purposeful, violent and aggressive."  *Id.* at 1586.

566 F. Supp. 2d at 1233 (footnoted omitted).  The court first concluded the Tenth Circuit had considered *Begay* as not overturning the precedent of escape being a crime of violence.  *Id.* at 1236 (citing *United States v. Ellis*, 525 F.3d 960, 965 (10th Cir.), *cert. denied*, 129 S. Ct. 318 (2008)).  Alternatively, the court found that the defendant's escape conviction for unauthorized departure from a halfway house was "roughly similar in kind as well as in degree of posed risk to the listed offense of burglary."  566 F. Supp. 2d at 1236.  The court reasoned:

> An offender of 18 U.S.C. §  751(a) acts purposefully and

4

deliberately by knowingly leaving the confines of his federal custody without the permission of federal authorities. This roughly parallels the purposefulness of a burglar who purposefully and knowingly enters upon another's property without authority. The kind of deliberate conduct involved in an escape is not so far removed from the "deliberate kind of behavior associated with violent criminal use of firearms." *Begay*, 128 S. Ct. at 1587. While a burglar also has the intent to commit a crime, an escapee knows his actions will be resisted by federal authorities specifically charged with the responsibility of doing so. Thus, an escapee typically would calculate the risk of this confrontation in deliberately leaving federal custody.

. . . The typical conduct involved in escaping from federal custody fits the meaning of aggressive as well as the typical conduct involved in burglary. An escapee takes the offensive in defying the authority of the federal officers to confine him. In doing so, the offender knows his actions will be considered hostile by the responsible federal officers who will be expected to resist, oppose and resolve the hostile situation with all reasonable force. Similarly, a burglar takes the offensive in trespassing upon another's property for the purpose of taking something while knowing that any occupant of the property would likely consider the burglar's actions to be a hostile action.

As discussed above, the Supreme Court in *Taylor* identified the violent aspect of a burglary as the possible confrontation between the burglar and the occupant or someone else investigating. 495 U.S. at 588, 110 S.Ct. 2143. The Court went so far as to recognize that "the offender's own awareness of this possibility may mean that he is prepared to use violence if necessary to carry out his plans or to escape." *Id.* More recently, the Supreme Court in *James* described this same possible confrontation as the "main risk of burglary." *James v. United States*, 127 S.Ct. at 1594. Thus, a burglar's entry need not be violent, for it creates the possibility of violence should the burglar confront an occupant, officer or bystander. This same kind of potential for violence exists with an escape offense, but it typically exists to a greater degree. With an escape, the offender may not need violence to leave his confinement, but his offense is not over until he is confronted by an officer in a situation typically accompanied by force and violence. *See United States v. Bailey*,

444 U.S. at 413, 100 S.Ct. 624 ("escape from federal custody as defined in 751(a) is a continuing offense and ... an escapee can be held liable for failure to return to custody as well as for his initial departure.").  As the defendant's plea agreement reflects, the defendant was arrested over two months after his escape from the halfway house.  If instead of surrendering immediately to the federal authorities, the escapee tries to avoid capture and arrest, then he necessarily contemplated the possible need for violence to avoid arrest.

The court is satisfied that the offense of escape in violation of 18 U.S.C. § 751(a) meets the trio of adjectives-"purposeful, violent and aggressive conduct"-as apparently defined and applied in *Begay*. The risk of confrontation posed by an escape is roughly similar to the risk of confrontation in burglary.

566 F. Supp. 2d at 1237-39.  The decision correctly and fully states the court's application of the Supreme Court's holding in *Begay* to a § 751(a) conviction for escape from a halfway house.

## Appeal

On appeal, the government joined the defendant in requesting that the defendant's "walkaway" escape not be treated as a crime of violence.  *United States v. Charles*, 576 F.3d 1060, 1066 (10th Cir. 2009). Because the government's agreement with the defendant does not control a court's interpretation of a federal law, the panel considered the effect of *Chambers* upon this Circuit's precedent.  576 F.3d at 1066-67.  "Before *Chambers*, the categorization of an escape conviction was well-settled in this Circuit, because we held that all escape convictions were 'crimes of

violence' under § 4B1.2." 576 F.3d at 1067 (citations omitted). "Thus, pre-*Chambers* we would likely have determined, as the district court did, that Mr. Charles's walkaway from a halfway house under § 751(a) constituted 'purposeful and aggressive' conduct that is 'roughly similar to the risk of confrontation in burglary.'" *Id.* at 1068 (citations omitted).

As observed by the panel, the holding in *Chambers* is that a failure to report conviction is not a violent felony because "'it does not involve conduct that presents a serious potential risk of physical injury to another,'" 576 F.3d at 1068 (quoting *Chambers*, 129 S. Ct. at 691), and because it "represent[s] 'a form of inaction, a far cry from the purposeful, violent, and aggressive conduct potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or engages in certain forms of extortion,'" *id.* (quoting *Chambers*, 129 S. Ct. at 691-92). The panel recognized that the Court in *Chambers* did not directly discuss "walkaway" escapes and did not address whether all escapes from custody convictions are violent crimes. 576 F.3d at 1068. The panel agreed with the Sixth Circuit in *United States v. Ford*, 560 F.3d 420, 424 (6th Cir. 2009), that walkaways are as a "distinct form of escape" as failures to report to custody. *Id.* at 1069. The Tenth Circuit concluded:

7

*Chambers* compels "a modification of our circuit precedent" and in turn, "the separate treatment of walkaway escapes after *Chambers* deserves an explanation." *Ford*, 560 F.3d at 426. This is no simple task and we acknowledge that the determination of whether Mr. Charles's conviction under § 751(a) was a career-offender-qualifying conviction requires some inquiry, "[a]nd sometimes the choice is not obvious." *Chambers*, 129 S.Ct. at 690. The application of the categorical method "is not always easy" because a subsection of a criminal statute may refer to several different crimes, "[a]nd it can happen that some of these crimes involve violence while others do not." *Nijhawan [v. Holder]*, 129 S.Ct. [2294] at 2299 [(2009)]. Indeed, in *Chambers*, Justice Alito wrote separately and recognized the many complications that accompany this task and "emphasize[d] that only Congress can rescue the federal courts from the mire into which ACCA's draftsmanship [here, the analogous career offender guidelines] and Taylor's 'categorical approach' have pushed us." 129 S.Ct. at 694 (Alito, J., concurring).

Because the district court limited its factual findings to pre-*Chambers* precedent, we must reverse and remand Mr. Charles's case for resentencing. The district court should analyze Mr. Charles's prior escape conviction under § 751(a) in light of *Chambers* to determine whether or not this conviction was a career-offender--qualifying escape from custody.

576 F.3d at 1069 (some citations omitted).

<u>Parties' Positions</u>

After the Tenth Circuit's filing of the mandate, this court set the case for resentencing and gave the parties a deadline for filing sentencing memoranda. As on appeal, the government submits that the defendant's prior escape conviction was not a crime of violence under § 4B1.2(a) and that the sentencing court erred in using a base offense level of 24 instead

of 20.  The government characterizes the defendant's prior escape

conviction as a "walkaway" escape and sets forth its current position on all

escape convictions:

> The government defines "walkaway escape" as an unauthorized departure from a minimum security or a no-security facility from where the person has "certain privileges of ingress and egress."  *See United States v. Piccolo*, 441 F.3d 1084, 1088 (9th Cir. 2006).  The Sentencing Commission Report relied on by the Court in *Chambers*, which will be discussed below, defines the term more broadly to include leaving or attempting to leave "custody with no significant physical restraint, such as a halfway house, a prison camp, home detention, or supervised work detail."  *Report on Federal Escape Offenses in Fiscal Years 2006 and 2007*, United States Sentencing Commission, p. 4 (Nov. 2008 (Attach. E).  The government draws the line at offenses where it is likely that an officer will be present at the time of the escape, the escape will be promptly detected, or there will be immediate pursuit.  That category encompasses escape from prison, escape from restraint, resisting arrest, and flight from an order to stop, but it does not include "walkaway escape."  *See also* U.S.S.G. § 2P1.1, cmt. n. 1 ("'Non-secure custody' means custody with no significant physical restraint (e.g., where a defendant walked away from a work detail outside the security perimeter of an institution; where a defendant failed to return to any institution from a pass or unescorted furlough; or where a defendant escaped from an institution with no physical perimeter barrier.").

(Dk. 61, p. 7 n. 4).

For the defendant's § 751(a) escape conviction, the

government quotes the count charged in the indictment to which the

defendant pleaded guilty.  It also attaches the plea agreement in which the

defendant stipulated to the following facts constituting the offense of

conviction:

> Defendant was confined at the Correctional Systems, Incorporated, a half-way house located in Leavenworth, Kansas, by virtue of or a judgment and commitment of the United States District Court for the District of Kansas sentencing the defendant to 100 months confinement based upon his conviction for violation of 21 U.S.C. § 841(a). The sentence was in case number 99-CR-40092-01-RDR. On September 27, 2005, the defendant was confined in the half-way house by virtue of this conviction and been designated to be confined there by the Bureau of Prisons. The Bureau of Prisons exercised said authority on behalf of the Attorney General. Defendant was observed leaving the half-way house without authority at approximately 6:05 a.m. on September 27, 2005. He remained at large until he was arrested by Deputy United States Marshals in Topeka, Kansas on December 8, 2005.

(Dk. 61-2, p. 38).

The government posits that "*Chambers'* rationale requires the

government to concede that the defendant's escape, i.e. 'leaving the half-

way house without authority' . . ., does not qualify as a 'crime of violence."

(Dk. 61, p.26 (record citation omitted)).  The government regards the

walkaway escape as "more closely related to the failure-to-report crime"

than the generic escape from secure custody.  *Id.* at  27.  The government

also opines that the offense conduct in a walkaway escape is "analytically

indistinguishable" from the conduct for those offenses grouped in

*Chambers* as failure-to-report escapes.  *Id.*  Content at first to state these

10

propositions summarily, the government argues later in its brief:

> To be sure, walkaway escape is not inactive as is failure to report/return; a defendant does more than "nothing." But he also is not breaking any restraint nor fleeing from the presence of a law enforcement officer, and thus the offense is different from escape from prison, escape from officer restraint, resisting arrest, or flight from an officer's command to stop. It does not involve the kind of purposeful and often violent and aggressive conduct *Begay* and *Chambers* found necessary to meet the similar-in-kind requirement of § 924(e)(2)(B)(ii)'s residual clause.

(Dk. 61, p. 30).

Next, the government argues the statistics used by the Supreme Court in *Chambers* present a comparable low likelihood of risk with walkaway escapes. The government extends its argument to the point of presuming the following:

> Because no guard or officer is likely to be present when the walkaway escape occurs, and it is therefore unlikely that there will be resistance or prompt pursuit, there is little risk of violence when the walkaway escape first occurs. If the perpetrator is challenged by a supervisory person at the door of the halfway house, for example, he is likely to defer his walkaway escape to another time. Although there may be exceptions to this general description of what occurs during walkaway escapes, such exceptional factual circumstances are not pertinent to the risk evaluation under § 924(e)(2)(B)(ii)'s residual clause.

(Dk. 61, p. 31). The government's brief cites no authority or evidence for what it claims to be a "general description of what occurs during walkaway escapes." *Id.*

Finally, the government maintains that the modified categorical approach is inapplicable as 18 U.S.C. § 751(a) is not divisible as was the escape statute discussed in *Chambers*. Consequently, the government suggests the court should follow the Seventh Circuit's approach in *United States v. Hart*, 578 F.3d 674, 681 (7th Cir. 2009), "that a violation of 18 U.S.C. § 751(a), as a categorical matter, is not a crime of violence under the Sentencing Guidelines." The government alternatively proposes following *United States v. Ford*, 560 F.3d 420, 424-25 (6th Cir. 2009), and treat walkaway escapes as a "separate crime" under the statute and conclude such escapes do present the risk of physical injury or the purposeful, violent and aggressive conduct as the listed crimes of violence.

Agreeing with the government's position, the defendant argues the modified categorical approach is inapplicable and, regardless of the approach taken, his walkaway conviction is not a crime of violence. The defendant re-characterizes his conduct as: "walking away from a situation in which one no longer wishes to remain is a passive act." (Dk. 64, p. 6). The defendant too relies on the statistical evidence from the report cited in *Chambers* and notes the Seventh Circuit's observation:

> "[I]t is an embarrassment to the law when judges based decisions of consequence on conjectures, in this case a conjecture as to the

possible danger of physical injury posed by criminals who fail to show
up to begin serving their sentences or fail to return from furloughs or
to halfway houses."

*Id.* at 7 (quoting *United States v. Chambers*, 473 F.3d 724, 726 (7th Cir.

2007), *rev'd and remanded*, 129 S. Ct. 687 (2009)).

<u>Preliminary Observation</u>

Though of no effect upon the reasoning or result in this case,

this court could not agree more with the Justice Alito's concurrence in

*Chambers*:

> I write separately, however, to emphasize that only Congress can
> rescue the federal courts from the mire into which ACCA's [Armed
> Career Criminal Act] draftsmanship and *Taylor*'s "categorical
> approach" have pushed us.
> . . . Legislating against the background of *McMillan [v.
> Pennsylvania*, 477 U.S. 79 (1986)], Congress may have assumed
> that ACCA's residual clause would similarly require federal
> sentencing judges to determine whether the particular facts of a
> particular case triggered a mandatory minimum sentence.
> But history took a different track. In *Taylor*, the Court held that
> ACCA requires "the sentencing court to look only to the fact that the
> defendant had been convicted of crimes falling within certain
> categories, and not to the facts underlying the prior convictions." 495
> U.S. at 600. Thus, we held that sentencing judges should apply a
> "categorical approach" to determine whether an underlying state
> offense meets the "generic" definition of burglary that this Court-not
> Congress-created. *Id.* at 598. . . .
> ACCA's clarity has been the true inadvertent casualty. After
> almost two decades with *Taylor*'s "categorical approach," only one
> thing is clear: ACCA's residual clause is nearly impossible to apply
> consistently. Indeed, the "categorical approach" to predicate offense
> has created numerous splits among the lower federal courts, the

> resolution of which could occupy this Court for years.  What is worse
> is that each new application of the residual clause seems to lead us
> further and further away from the statutory text.  Today's decision, for
> example, turns on little more than a statistical analysis of a research
> report prepared by the United States Sentencing Commission.
> (citation omitted).

129 S. Ct. at 694-695.  The array of lower court decisions confirm Justice

Alito's comments.  *Taylor*'s categorical approach and the vague residual

clause, "conduct that presents a serious potential risk of physical injury to

another," are a deadly combination putting to rest any hope of consistent

application.  This court also appreciates Justice Alito's candor in noting

how subsequent Supreme Court decisions have done little more than layer

on language that has moved analysis even further from the actual statutory

text.

### United States v. Chambers

While the essential points of the Supreme Court's holding have

been discussed above, the court here wants to draw out some language

from *Chambers* and to highlight this court's struggle in applying it.  As with

almost all such cases, the first and highest hurdle comes with the

categorical approach.  The Supreme Court in *Chambers* explained that the

categorical approach rests on a classification made from examining the

"generic crime," that is, by "refer[ring] to a crime as generally committed."

129 S. Ct. at 690.  It acknowledged this "approach requires courts to choose the right category" and a court's choice sometimes "is not obvious." *Id.*  The Court further observed: "The nature of the behavior that likely underlies a statutory phrase matters in this respect," and cites as an example the "significant[]" difference in behavior between the breaking into a building and the breaking into a vehicle as justifying "treat[ing] the two as different crimes".  *Id.* (citing *Shepard v. United States*, 544 U.S. 13, 16-17 (2005), and *Taylor v. United States*, 495 U.S. 575, 598 (1990)).

In concluding that the failure to report escape "is a separate crime," the Court made the following distinction:  "The behavior that likely underlies a failure to report would *seem less likely to involve a risk* of physical harm than the less passive, more aggressive behavior underlying an escape from custody."  129 S. Ct. at 691 (citation omitted) (italics added).  The Court next looked at the Indiana escape statute and its seven kinds of behavior delineated there.   The Court grouped the "various kinds of failure to report (or to return)" as similar in that "[e]ach is characterized by a failure to present oneself for detention on a specified occasion."  *Id.* The Court also set out another category of crime under the Indiana statute as "escape from custody" and finally noted, "[f]ailure to abide by home

confinement terms-potentially the least serious of the offenses-is not at issue here." *Id.*

In categorizing offenses, *Chambers* compels considering both the kinds of conduct[3] and the degrees of risk involved. As for what similarities or differences will justify grouping or separating offenses by category, the guidance offered in *Chambers* principally comes from what can be drawn out of the Court's discussion of the facts. Specifically, the Supreme Court held that an escape from custody involves behavior distinct from the "failure to present oneself for detention on a specified occasion" and that "a failure to report would seem less likely to involve a risk of physical harm than the less passive, more aggressive behavior underlying an escape from custody." *Id.* at 691.

*Chambers* establishes there is no longer just one category for escapes under a statute that addresses several different kinds of behavior. But in the case of a broadly-worded escape statute, like 18 U.S.C. § 751(a), how many categories of escape exist? If a court were to work only

---

[3]This court admits to some confusion after *Chambers* on how to articulate this process. Should a court's determination focus on whether the underlying behavior "differs significantly" that "a sentencing court must treat the two as different crimes," 129 S. Ct. at 690, or should a court focus on whether offenses "describe roughly similar forms of behavior" so as to be regarded "as constituting a single category," 129 S. Ct. at 691.

with the two categories set out in *Chambers*, the question would be

whether the unauthorized departure from a halfway house is more like an

escape from custody or more like a failure to present oneself for detention?

Looking at the nature of the underlying behavior alone, the answer would

seem that a person leaving the custody of a halfway house is more akin to

escape from custody. *See United States v. Ford*, 560 F.3d 420, 423 (6th

Cir. 2009). Indeed, the Fifth Circuit in an unpublished opinion rested on

this appearance alone:

> In *United States v. Ruiz*, 180 F.3d 675, 676 (5th Cir. 1999), we
> rejected an argument that a walkaway escape from a community
> treatment center or correction center does not qualify as a COV
> ["crime of violence"]. The Supreme Court recently distinguished a
> state offense of failing to report for periodic imprisonment from the
> offense of escape, stating that "[t]he behavior that . . . underlies a
> failure to report would seem less passive, more aggressive behavior
> underlying an escape from custody." *Chambers v. United States*,
> 129 S. Ct. 687, 691 (2009). We read *Chambers* as consistent with
> *Ruiz*, and Delgado's escape conviction [walkaway from a halfway
> house] is a COV.

*United States v. Delgado*, 320 Fed. Appx. 286, 286-87, 2009 WL 959507

(5th Cir. Apr. 9, 2009), *petition for cert. filed*, --- S. Ct. --- (Jul. 2, 2009) (No.

09-5168).

          To leave the custody of the halfway house in defiance of on-site

staff authority is "roughly similar" to an escape from custody and is "less

passive, more aggressive behavior" than not reporting or returning to custody.  Is this enough for putting walkaway escapes into the category with other escapes from custody or are the differences in degree of risk, if any, sufficient to prevent such a grouping?  Is a walkaway "less likely to involve a risk of physical harm" as the generic escape from custody?  What are reliable sources for characterizing halfway house custody and for determining the risks of physical harm associated with an escape from a halfway house?  How much difference in degrees of risk would prevent categorizing together underlying behavior that is similar in form?

Somewhat like the proverbial blindfolded person trying to identify an elephant, a court could start at different points in trying to get a handle on this analysis.  It could adopt the strict categorical approach taken in *Hart* and find "that a violation of 18 U.S.C. § 751(a), as a categorical matter, is not a crime of violence under the Sentencing Guidelines."  578 F.3d at 681.  For reasons given later, this approach seems foreclosed by the Tenth Circuit's decision on appeal here.  Another approach would be to focus on contrasting the degrees of involved risk and to consider grouping walkaway escapes with failure to report/return escapes.  Yet another approach would be for the court to consider additional categories that

would distinguish between escapes from secure settings and those from non-secure settings. The court's analysis then would proceed to deciding whether an escape from non-secure custody is a crime "roughly similar, in kind as well as in degree of risk posed," to the listed offenses of burglary, arson, or extortion. *Begay*, 128 S. Ct. at 1585.

If it were to take the last approach and recognize a category of escapes from non-secure custody, the court would face still more hurdles in interpreting and applying *Chambers*. The Supreme Court's analysis began with conceptualizing the failure to report as a "form of inaction" that is "a far cry from the 'purposeful, violent, and aggressive conduct' potentially at issue when an offender" commits one of the listed offenses. 129 S. Ct. at 692. The Court found it had "no reason to believe" that the offender's behavior "at the relevant time . . . pose[d] a serious potential risk of physical injury." *Id.* At this point in its analysis, the Court intuited the motive of an offender who had not reported to be that he "would seem unlikely, not likely, to call attention to his whereabouts by simultaneously engaging in additional violent and unlawful conduct." *Id.* Responding to the government's contention that such offenders have a "special, strong aversion to penal custody," the Court fashioned the inquiry as "whether such an offender is

significantly more likely than others to attack, or physically to resist, an apprehender, thereby producing a 'serious potential risk of physical injury.'" *Id.* The Court found that a United States Sentencing Commission report of 2006 and 2007 federal cases applying the guideline provision for escapes did "help[] provide a conclusive, negative answer." *Id.* The report disclosed no acts of violence during the commission of the offense and in the subsequent apprehension, "although in 5 instances (3.1%) the offenders were armed." *Id.* "The upshot is that the study strongly supports the intuitive belief that failure to report does not involve a serious potential risk of physical injury." *Id.*

The district court already has offered its conceptualization of walking away from a halfway house in its earlier opinion and there found that it was "roughly similar in kind as well as in degree of posed risk to the listed offense of burglary." 566 F. Supp. 2d at 1236. So, what effect does *Chambers* have upon that analysis? First, not every escape is considered a powder keg, and a court may not presume that every escapee "is likely to possess a variety of supercharged emotions, and in evading those trying to recapture him, may feel threatened by police officers, ordinary citizens, or even fellow escapees," such that "violence could erupt at any time." *United*

*States v. Gosling*, 39 F.3d 1140, 1142 (10th Cir. 1994), *abrogation recognized by*, *United States v. Pappan*, 315 Fed. Appx. 677, 681, 2009 WL 489963 at *3 (10th Cir. 2009).  Second, this powder keg rationale appears to have been replaced with this test:  "whether such an offender is significantly more likely than others to attack or physically to resist, an apprehender, thereby producing a serious potential risk of physical injury." *Chambers*, 129 S. Ct. at 692.  Third, in applying such a test, a court's "intuitive belief" may need to be supported by some evidence, *e.g.*, a statistical study.

　　　　To apply *Chambers* here, the court would need to address several questions, including the following.  May a court still consider the powder keg rationale as part of its intuitive belief or must there be some statistical support for every kind of escape?  In deciding whether an offender is significantly more likely to attack or resist an apprehender, who are the "others" [other offenders] to be considered in making that determination?  What statistics for these "others" should a court use in its analysis?  When is the likelihood of resisting or attacking an apprehender "significantly more?"  Should a court be considering statistical evidence of the risk of physical injury in burglaries and the other listed offenses?

*Analysis and Conclusion*

The court must look to the Tenth Circuit's written opinion on the categorical approach as the law of the case and controlling in the absence of any intervening precedent:

> In determining whether a conviction qualifies as a crime of violence under § 4B1.2, the Supreme Court has instructed courts to engage in "'a formal categorical approach, looking only to the statutory definitions of the prior offenses, and not to the particular facts underlying those convictions.'" *United States v. Dennis*, 551 F.3d 986, 988 (10th Cir. 2008) (quoting *Taylor v. United States*, 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)). Under this approach, we "consider the offense generically, that is to say, we examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay v. United States*, --- U.S. ----, 128 S.Ct. 1581, 1584, 170 L.Ed.2d 490 (2008); *Nijhawan v. Holder*, --- U.S. ----, 129 S.Ct. 2294, 2299, 174 L.Ed.2d 22 (2009) (noting the Court looks to the word " 'felony' to refer to a generic crime as generally committed") (emphasis supplied). If the statute is "ambiguous, or broad enough to encompass both violent and nonviolent crimes," *Dennis*, 551 F.3d at 988, we employ the so-called "modified categorical approach" which allows analysis of "certain records of the prior proceeding, such as the charging documents, the judgment, any plea thereto, and findings by the sentencing court." *Id.* (alterations, citations, and quotations omitted); *Nijhawan*, 129 S.Ct. at 2299. Such review does not involve a subjective inquiry into the facts of the case, but rather its purpose is to determine "which part of the statute was charged against the defendant and, thus, which portion of the statute to examine on its face." *United States v. Sanchez-Garcia*, 501 F.3d 1208, 1211 (10th Cir. 2007) (internal quotation and citation omitted).
> In this case, Mr. Charles was convicted under 18 U.S.C. § 751(a), which prohibits the generic crime of "escap[ing] or attempt[ing] to escape from the custody of the Attorney General," and includes failing to return to custody. 18 U.S.C. § 751(a). The district court

apparently considered the plea agreement, which specified that Mr. Charles had escaped the custody of a halfway house, but the court was without the benefit of the Supreme Court's decision in *Chambers*.

576 F.3d at 1067. Notably, the panel included the modified categorical approach in its summary of the law on this issue and observed without criticism that the district court had considered the plea agreement in determining the defendant's escape was from the custody of a halfway house. The panel remanded this case for the district court to consider *Chambers* and any subsequent precedent and to address "the separate treatment of walkaway escapes." 576 F.3d at 1069. The panel specifically directed that "[t]he district court should analyze Mr. Charles's prior escape conviction under § 751(a) in light of *Chambers* to determine whether or not this conviction was a career-offender-qualifying escape from custody." *Id.* The panel cited in support of this direction the following cases with parenthetical comments:

> *See United States v. Pearson*, 553 F.3d 1183, 1186 (8th Cir. 2009) (concluding post-*Chambers* that 18 U.S.C. "§ 751(a) is overinclusive because it covers conduct that does and does not trigger the career offender enhancement" and therefore remanding for a determination of whether the conviction at issue "was a career-offender-qualifying escape from custody, or a non-qualifying failure to return or report to custody"); *United States v. Harris*, No. 08-1090, 2009 WL 1610151, ---Fed.Appx. ---- (10th Cir. June 10, 2009) (remanding where defendant had apparently attempted to escape from community corrections center in violation of a Colorado statute, noting "we need

23

not decide whether *Chambers* dictates that an attempted walk-away escape from a community corrections program is or is not a crime of violence because-subsequent to briefing-the parties agreed that this case should be remanded to the district court for resentencing using a modified categorical approach"); *United States v. Young*, 318 Fed. Appx. 715 (10th Cir. 2009) (remanding where the record did not establish the nature of defendant's escape from a community corrections center or the escape statute under which defendant was convicted, for resentencing post-*Chambers*).

576 F.3d at 1069. This court reads the panel's opinion to direct that on

remand the modified categorical approach is to be used in determining

whether the defendant's conviction under 18 U.S.C. § 751(a) for escaping

from the custody of a halfway house is a crime of violence.

Despite the panel's opinion[4] and the law of the case doctrine,[5]

_____

[4]If the appellate panel in *Charles* had believed the strict categorical approach was applicable here, then there was no need for a decision on remand and, instead, the panel should have ruled as a matter of law that under *Chambers* the defendant's conviction under § 751(a) was not a crime of violence.

[5]"[W]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand. If there is an appeal from the judgment entered after remand, the decision on the first appeal establishes the law of the case to be followed on the second." *United States v. Monsisvais*, 946 F.2d 114, 116 (10th Cir. 1991) (internal quotations omitted); *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir.) ("Accordingly, when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal." (internal quotations omitted)), *cert. denied*, 525 U.S. 905 (1998).

the parties would have this court follow the strict categorical approach followed by the Seventh Circuit in *United States v. Woods*, 576 F.3d 400 (7th Cir. 2009), and in *United States v. Hart*, 578 F.3d 674 (7th Cir. 2009). The panel in *Hart* notes that *Woods* establishes a "strictly formal approach" in which a court employs the categorical method unless the statute is divisible because it "expressly identifies the several ways in which a violation may occur." 578 F.3d at 680. Applying *Woods*, the panel in *Hart* found that a violation of 18 U.S.C. § 751(a) was categorically not a crime of violence under guidelines.

   The court rejects the parties' united offer to fall in step with the Seventh Circuit's "strictly formal" categorical approach toward § 751(a) violations. The court considers that approach to be contrary to the law of this case as established on appeal. Additionally, this approach toward a § 751(a) violation was not followed by the Eighth Circuit in the published opinions of *United States v. Mills*, 575 F.3d 833 (8th Cir. 2009) (modified categorical approach) and *United States v. Pearson*, 553 F.3d 1183, 1186 (8th Cir. 2009) (modified categorical approach), nor did the Tenth Circuit take this approach toward a state escape statute having similar ambiguous language, *United States v. Avalos*, 315 Fed. Appx. 731, 733, 2009 WL

541336 at *2-*3 (10th Cir. Mar. 5, 2009). Finally, the court's impression of Tenth Circuit decisions after *United States v. Zuniga-Soto*, 527 F.3d 1110 (10th Cir. 2008), is that circuit panels are not settled on limiting the modified categorical approach strictly to statutes with plainly divisible terms. *See, United States v. Scoville*, 561 F.3d 1174, 1178 n. 3 (10th Cir. 2009) (discuss the narrow approach of *Zuniga-Soto* when the statute "contains multiple parts and meets this approach"), *cert. denied*, --- S. Ct. ---, 2009 WL 1981398 (U.S. Oct 5, 2009 (No. 09-5121), *but see, United States v. Charles*, 576 F.3d 1060 (10th Cir. 2009); *United States v. Avalos*, 315 Fed. Appx. 731 (10th Cir. 2009). For these reasons, the court will follow the modified categorical approach.

   *Chambers* establishes at least two categories of escape offenses but recognizes that other categories may exist, such as a category for failure to abide by home confinement terms. 129 S. Ct. at 691. If limited to the two categories, the court's choice for walkaway escapes would depend largely on whether emphasis was placed on either the similar form of behavior or the similar degree of risk. As the Sixth Circuit in *Ford* observed, treating walkaway escapes on this "level of generality is destiny." 560 F.3d at 424.

Federal law supports regarding walkaway escapes as "a meaningfully distinct and meaningfully distinguishable category of escape." 560 F.3d at 424. The United States Sentencing Guidelines view a walkaway escape as less serious:

> If the defendant escaped from the non-secure custody of a community corrections center, community treatment center, "halfway house," or similar facility, and subsection (b)(2) is not applicable, decrease the offense level under subsection (a)(1) by 4 levels or the offense level under subsection (a)(2) by 2 levels. *Provided*, however, that this reduction shall not apply if the defendant, while away from the facility, committed any federal, state, or local offense punishable by a term of imprisonment of one year or more.

U.S.S.G. § 2P1.1(b)(3). Application note one defines "non-secure custody" to

> "mean[] custody with no significant physical restraint (<u>e.g.</u>, where a defendant walked away from a work detail outside the security perimeter of an institution; where a defendant failed to return to any institution from a pass or unescorted furlough; or where a defendant escaped from an institution with no physical perimeter barrier).

U.S.S.G. § 2P1.1, comment. (n. 1). Plainly, the Sentencing Commission has found it empirically significant to distinguish escapes from non-secure custody and to regard such offenses as deserving a shorter sentence. The Commission's weighting of this distinction by a four-level reduction indicates the difference is meaningful. It certainly seems reasonable for a court to consider other provisions of the Sentencing Guidelines in categorizing

27

offenses under U.S.S.G. § 4B1.2.  Finally, the Sentencing Commission's report discussed in *Chambers* separately analyzes injuries or the use of force or dangerous weapon between escapes from non-secure custody and escapes from secure custody.  129 S. Ct. at 694.  This report characterizes an escape from non-secure custody or walkaway as happening when "the escapee left (or attempted to leave) custody with no significant physical restraint, such as a halfway house, a prison camp, home detention, or a supervised work detail."  (Dk. 61-2, p. 50).  From these reported empirical findings and the definitions based therefrom, the court will treat the defendant's walkaway escape from a halfway house as an escape from non-secure custody, that is, custody with no significant physical restraint or barrier.  *See Ford*, 560 F.3d at 424.

The analysis now turns to whether a walkaway escape is roughly similar in kind and in degree of risk to the enumerated offenses. The Sixth and Seventh Circuits have had no difficulty concluding that walkaways do not present the same risks or same kind of purposeful, violent and aggressive behavior.  *United States v. Ford*, 560 F.3d 420, 426 (6th Cir. 2009) ("[A] walkaway is not a crime of violence.");  *United States v. Templeton*, 543 F.3d 378, 383 (7th Cir. 2008) ("A walkaway is not a crime of

violence under *Begay*."); *but see United States v. Delgado*, 320 Fed. App. 286, 287, 2009 WL 959507 (5th Cir. 2009).  The Sixth Circuit was not presented with any empirical evidence to support a contrary finding and further found that the Seventh Circuit's statistical evidence was consistent with its finding of no violence.  *Ford*, 560 F.3d at 424.

The difficulty with such evidence is the determination of when the incidence of injury becomes serious as judged against the risk of injury in the enumerated offenses or the "other" offenders referenced in *Chambers*.  With escape offenses, a court looks to "the likelihood that violence would accompany commission of the escape or the offender's later apprehension."  *Chambers*, 129 S. Ct. at 692.  By its definition of non-secure custody and the suggested offense levels in the guidelines, the Sentencing Commission considers such escapes as committed to be less serious than other escapes, and the Commission's report discussed in *Chambers* does support this same conclusion.  But as asked above, is this enough for the court to find that the commission of an escape from non-secure custody has a less serious potential risk of physical injury than a burglary?  Should the court feign knowing how walkaway escapes from halfway houses generally occur and follow the government's

29

characterization for which there is no cited authority or evidence? (Dk. 61, p. 31). In answering these questions before the appeal, this court attempted to answer these questions after simply and rightly presuming that halfway houses are staffed and that residents are monitored including their coming and going. After *Chambers*, there is reason to question this approach as acceptable particularly when the government does not come forward with some support for characterizing how the generic crime is generally committed. Admittedly, the court's prior impressions even may be questioned in light of the report discussed in *Chambers*.

Being a continuing offense, the court also must consider the likelihood of violence in the escapee's later apprehension. The Seventh Circuit noted in *Templeton*, "[b]urglary rarely leads to physical injury," but the Supreme Court in *James* "held that even attempted burglary creates a serious potential risk of violence." 543 F.3d at 381. Prior to *Chambers*, courts would compare this serious potential risk in burglaries with the "powder keg rationale" associated with the recapture of escapees. For now, courts no longer may rely on this rationale particularly when the escape is from non-secure custody.[6] Looking at the Commission's report followed in

_____

[6]*James* recognizes the serious potential of force and physical injury occurring in a confrontation between a burglar and a person in the

*Chambers*, the court is left to consider a small percentage of violent

incidents (for escapes from non-secure custody 1.7% of the cases involved

force and 1.7% of the cases involved injury) without any proof of the

percentage of violent incidents occurring in burglaries.  Absent a context for

comparing these percentages, it seems a simple matter to conclude they do

not establish a "serious potential risk of physical injury."

      In light of *Chambers* and the analysis and evidence used in that

decision, the court finds that the government has failed to come forth with

sufficient proof to establish a base offense level of 24.  The defendant's

objection is sustained.  Using a base offense level of 20, U.S.S.G. §

2K2.1(a)(4)(A), the defendant's total offense level is 17, after deducting the

acceptance of responsibility adjustment.  The advisory guideline sentencing

range is 37 to 46 months based on a criminal history category of four.

      IT IS THEREFORE ORDERED that the defendant's objection to

the PSR is sustained.

───────────────────

residence.  It would be interesting to know if law enforcement officers in
deciding on the necessary and appropriate safety precautions to use in
executing arrest warrants (*e.g.*, weapons drawn, multiple officers present,
and other exits covered) would be significantly influenced by the nature of
the custody from which the suspect escaped, as opposed to the suspect's
criminal history and other circumstances possibly more relevant in the
actual execution of the warrant.

Dated this 27th day of October, 2009, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge